## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ETDO PRODUCTIONS, LLC,** | |
| Plaintiff, | |
| v. | |
| **ALFREDO CRUZ, ET AL.** | **CIVIL ACTION NO. 19-CV-13184-ILRL-DMD** |
| Defendants. | |
| **DISCO AMIGOS SOCIAL AID AND PLEASURE CLUB,** | **JUDGE IVAN L.R. LEMELLE** |
| Counterclaimant, | **MAGISTRATE JUDGE DANA M. DOUGLAS** |
| v. | |
| **ETDO PRODUCTIONS, LLC, ET AL.** | |
| Counter-Defendants. | |

### DEFENDANTS' POST-TRIAL MEMORANDUM

Defendant-Counterclaimant Disco Amigos Social Aid and Pleasure Club ("Nonprofit") and Defendants Alfredo Cruz, Michele Rossi, Michele Hudak, Marisa Naquin, Sonya Bourgeois, Lisette Bayle, and Renee Pastor (collectively "Defendants"), by and through their attorneys, respectfully submit this post-trial brief pursuant to the Court's Order [Doc. 98].

Defendants, Plaintiff-Counter-Defendant ETDO Productions, LLC ("ETDO"), and Counter-Defendants Jerry Lenaz ("Lenaz") and Francois Camenzuli ("Camenzuli") all agree as to the central issue in this case: Who is the rightful owner of service marks DISCO AMIGOS and DISCO AMIGOS LOGO ("the marks," as used for performance and educational services)?

The parties do not dispute the creation of the term DISCO AMIGOS and the DISCO AMIGOS LOGO by Camenzuli and Lenaz, respectively. What is disputed is (1) whether the

mere fact of creating the marks, and having token use in late 2011 and early 2012 followed by the exclusive continuous use of the marks by Nonprofit for more than eight years, entitled Lenaz and Camenzuli to ownership of the marks; and (2) whether such individual ownership, if any, could be transferred in 2015 to Lenaz- Camenzuli-owned for-profit entity, ETDO, via an alleged assignment[1] notwithstanding continuous use of the marks in commerce exclusively by Nonprofit, whose membership played a significant role in promotion and growth, beginning in May 2012.

The only answer to these two questions is "NO" as neither Lenaz nor Camenzuli had rights in the marks that could have been transferred to ETDO by the assignment. Creation of the marks, in and of itself, does not vest any rights in the marks absent *bona fide* use in commerce in the ordinary course of business. "*Bona fide*" sale means a substantial number of sales. "Token use" of the marks cannot support the claim of ownership.[2] Merely displaying a van with bullhorns and a nose ring, without the relevant services, does not establish the marks as a source identifier worthy of conferring rights. After all, one or two displays of the van hardly cemented in the mind of the public that the relevant services originated from a single source – the crux of trademark doctrine. Such displays are nothing but a token use and thus insufficient to warrant trademark protection.

Only when the marks are used in the ordinary course of business, i.e. sufficiently used to allow the public to identify the marks with a single source of the relevant services, can trademark rights be protected. Here, the marks identify Nonprofit as the single source to the public.

Moreover, the assignment is doubtful because neither the Nonprofit's membership nor its Board of Directors, the true users of the marks, had any knowledge of the assignment allegedly executed on January 15, 2015, until October 2019 when ETDO filed the instant lawsuit.

---

[1] Exh. 259, alleged Assignment dated January 15, 2015.
[2] *See* 15 U.S.C. 1127.

After twenty-two witnesses during trial, ETDO failed to prove essential elements of its case against Defendants. First, ETDO's ever-changing story of which individual(s) and/or entity own(s) the marks exposes inconsistencies in its narrative; where it was "Disco Amigos Enterprises;"[3] then Lenaz and Camenzuli, individually;[4] then ETDO, here, through the assignment allegedly executed on January 15, 2015;[5] and finally, the alleged "ETDO Joint Venture" that came into existence late in the course of this litigation.[6] Importantly, none of the stories can prove ownership of the marks by ETDO – the marks have to be <u>used in commerce in the ordinary course of business</u> "to identify and distinguish [one's services] from the services of others and to indicate the source of the services ...."[7] Rather, the evidence shows Lenaz and Camenzuli, the alleged assignors, made token use of the marks in one or two instances. After incorporating in Louisiana on May 16, 2012 and filing with the IRS for nonprofit designation under IRC 501(c)(7), Nonprofit became the exclusive user of the marks in commerce in connection with the relevant services, and continues as so as it has for eight consecutive years, and so the marks identify and have always identified Nonprofit as the single source to the public.

Second, ETDO failed to establish a violation of the Unfair Trade Practices and Consumer Protection Law ("LUTPA"). LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ...."[8]

ETDO's argument under LUTPA claim is entirely based on the alleged trademark infringement. As ETDO submitted, "should the Court determine that defendants have infringed

---

[3] Exh. 20, Cease-and-Desist letters (2) dated September 10 and 11, 2019.
[4] Exh. 311, Petition filed in Orleans Parish on September 20, 2019, pp. 3, paras. 15-16.
[5] Exh. 259, alleged Assignment dated January 15, 2015.
[6] Doc. 89, Joint Proposed Pre-Trial Order, p. 4
[7] 15 U.S.C. 1127
[8] La. R.S. 51:1405(A). "A business practice is considered 'unfair' if it offends established public policy and is unethical, oppressive, unscrupulous, or substantially injurious. A business practice is 'deceptive' ... when it amounts to fraud, deceit or misrepresentation." *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 843 (5th Cir. 2002) [citing *Jefferson v. Chevron U.S.A. Inc.*, 713 So. 2d 785, 792-93 (La. Ct. App. 1998)].

on [ETDO's] trademark, then the Court should grant the claim for LUTPA as [ETDO] has suffered a loss as a result of the unfair and deceptive infringement on its trademark."[9] However, ETDO never developed its argument on trademark infringement, instead relying on the creation of the marks by Lenaz and Camenzuli, and their token use of the marks in late 2011 and early 2012. This token use is not sufficient to confer substantive rights on the creators of the marks.

Further, for more than seven years, during which Nonprofit was the exclusive user of the marks, neither Lenaz nor Camenzuli raised the issue of a license with or infringement by Nonprofit. It was only in August 2019 when Lenaz and Camenzuli, calling themselves "founders," started the dispute with Nonprofit, alleging their and ETDO's rights in the marks and demanding the Board of Directors of Nonprofit ("Board") sign a license agreement.[10] Notwithstanding that Nonprofit did not need a license, the proposed agreement would have had a crippling financial effect on Nonprofit and so the Board – acting in the best interest of the Nonprofit – refused to sign it, and this controversy followed.

On the other hand, Defendants presented ample evidence to support their counterclaims. ETDO has engaged in unfair competition with Nonprofit in violation of 15 U.S.C. 1125(a) by its unauthorized use of the marks in commerce, by falsely alleging itself to be the owner of the marks, thus causing confusion by its alleged association and connection with Nonprofit, the source of the true provider of the relevant services. ETDO also engaged in "passing off" actions in violation of 15 U.S.C. 1125(a) by falsely advertising under the marks in commerce, thereby causing substantial damage to the goodwill and image of Nonprofit as the true source identified by the marks. ETDO's actions have deprived Nonprofit of the ability to control the public

---

[9] Doc. 91, p. 11, para. 14.
[10] Exh. 260, License Agreement proposed by ETDO on August 21, 2019.

perception of its services offered under the marks. Therefore, ETDO's actions entitle Nonprofit to recovery of damages pursuant to 15 U.S.C. 1117.

Nonprofit showed that ETDO engaged in the acts of unfair competition in violation of LUTPA. ETDO has used the marks without authorization from Nonprofit, falsely represented to be the owner of the marks, passed off its services as originating with Nonprofit, and falsely associated with the services provided by Nonprofit in commerce. ETDO's actions have caused injury to Nonprofit's reputation, which entitles it to an injunction pursuant to La. R.S. 51:223.1.

Nonprofit showed that ETDO made false, deceptive, and misleading assertions, representations, and statements of fact, advertising under the marks, which constitute willful and false advertising under La. R.S. 51:411. Nonprofit presented ample evidence that ETDO actually and proximately caused damage to Nonprofit by negligently interfering with existing and potential contractual relationships of Nonprofit with Mardi Gras Krewes, thus entitling Nonprofit to injunctive relief pursuant to La. C.C. 2315. Nonprofit presented ample evidence that Lenaz and Camenzuli, individually, breached their fiduciary duties as officers of Nonprofit by acting against the interests of Nonprofit in dealings with their own for-profit company, ETDO.

## ARGUMENT[11]

### A.    The Evidence Shows ETDO Failed to Prove Ownership of the Marks.

ETDO has not demonstrated that it is the rightful owner of the marks. A party alleging trademark infringement of an unregistered mark, like ETDO here, must show: (1) ownership in a legally protectable mark, and (2) a likelihood of confusion in the minds of potential customers caused by the infringer's use of the mark.[12] Ownership of a mark is established by use in the

---

[11] Defendants' Proposed Findings of Fact and Conclusions of Law [Doc. 90] are hereby incorporated by reference.
[12] *Bd. of Supervisors for La. State Univ. Agric. and Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008).

market.[13] Furthermore, to prove trademark ownership, ETDO must demonstrate that it meets all three elements of the test established in *Lyons v. Am. Coll. of Veterinary Sports*: (1) the parties' objective expectations; (2) who the public associates with the marks; and (3) to whom the public looks to stand behind the quality of services under the marks.[14]

Throughout the trial, ETDO asserted its ownership of the marks based on Lenaz and Camenzuli's creation of the idea for the world's largest disco party. However, even if Camenzuli created the moniker and Lenaz designed the logo, Lenaz and Camenzuli's activities prior to the founding of Nonprofit in May 2012 were in the nature of planning the formation of Nonprofit, and constitute merely token use of the marks in relation to the relevant services.[15]

ETDO identified the following facts in support of its first use of the marks: (a) a modified, used van sold to ETDO by John Tiblier, the van carrying bullhorns and a nose ring;[16] (b) the name El Toro De Oro on the van;[17] (c) the DISCO AMIGOS LOGO on the van;[18] (d) the van used in the Krewe of Muses parade in February 2012;[19] (e) the van with a "Disco Amigos" banner on it;[20] (f) Lenaz set up the [www.discoamigos.com] website in March of 2012;[21] (g) t-shirts sold to new members;[22] (h) flyers with "Disco Amigos" handed out outside of Jazz Fest in 2012;[23] (i) the first dance practice on April 12, 2012;[24] (j) some dance classes conducted in

---

[13] *Id.* at 475; *Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Austin*, 909 F.2d 839, 842 (5th Cir. 1990).
[14] *Lyons v. Am. Coll. of Veterinary Sports*, 859 F.3d 1023, 1024-25 (Fed. Cir. 2017).
[15] Mrs. Adele Tiblier (wife of John Tiblier of ETDO) testified that in the beginning of 2012, the promotional flyers that she prepared simply said "Come Dance with the Amigos." A. Tiblier, Transcript of Bench Trial, Day 2 [Doc. 106], p. 285, lines 1-3. There was no mention of ETDO, and the disco logo might not even have the horns. A. Tiblier, Transcript of Bench Trial, Day 2 [Doc. 106], p. 283, line 21, through p. 284, line 20.
[16] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 14, lines 2-3.
[17] Janowski, Transcript of Bench Trial, Day 1 [Doc. 105], p. 110, lines 9-12.
[18] Janowski, Transcript of Bench Trial, Day 1 [Doc. 105], p. 110, lines 23-24.
[19] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 15, lines 10-15.
[20] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 29, lines 5-8.
[21] Lenaz, Transcript of Bench Trial, Day 2 [Doc. 106], p. 355, lines 3-14.
[22] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 41, line 19.
[23] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 42, lines 1-13.
[24] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 42, lines 14-19.

2012;[25] and (k) in April or May 2012, during Jazz Fest, the van promoted disco dances under "DISCO DE MAYO" name.[26] Significantly, nowhere in these events, was ETDO, ETDO-JV, or Disco Amigos Enterprises mentioned; and no relevant services had been provided to the public.

This dearth of credible evidence of *bona fide* use by Lenaz, Camenzuli, or ETDO is not striking since their own witnesses admitted that any pre-Nonprofit use was minimal, at best. But rather than simply end this controversy by producing definitive proof of *bona fide* use by Lenaz, Camenzuli, or ETDO, they denied Nonprofit's access to the corporate database, refused to produce any such evidence during discovery, and then failed to produce any such evidence at trial. ETDO's failure to produce this evidence is a failure to meet its burden of producing evidence, i.e. failure to meet its burden of proof of *bona fide* commercial use of the marks.

On the other hand, substantial evidence establishes that after token use of the marks by Lenaz and Camenzuli, it was only Nonprofit via its membership who provided the relevant performance and educational services under the marks.[27] ETDO's role was limited to renting the van, sound equipment, lights, and such, i.e. production services, to Nonprofit. ETDO did not conduct rehearsals, hold classes, or render dance performances.[28] It was Nonprofit via its membership Committees who conducted classes, rehearsals, and provided live entertainment in the form of disco dancing at a variety of events since 2012.[29] The events in which Nonprofit membership participated are numerous, not just the few parties or parades where ETDO rented out its van and sound equipment. Mr. Roy Guercio testified that Nonprofit did "a ton of them."[30] According to Mr. Guercio, his participation in performances averaged about twenty events per

---

[25] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 90, lines 12-13.
[26] Lenaz, Transcript of Bench Trial, Day 2 [Doc. 106], p. 360, lines 1-8.
[27] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 90, lines 16-17.
[28] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 588, line 15, through p. 589, line 24.
[29] Lenaz, Transcript of Bench Trial, Day 2 [Doc. 106], p. 373, line 1 through p. 377, line 23; Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], 588, line 15, through p. 589, line 24.
[30] Guercio, Transcript of Bench Trial, Day 2 [Doc. 106], p. 447, lines 2-17.

year during his five-year membership with Nonprofit.[31] Nonprofit continues to provide the relevant services now that its relationship with the production company has ended.

It is axiomatic that a mark must be used continuously in commerce in providing a service. Absent continuous use by a first user, a mark is considered abandoned.[32] Such is the case here: Lenaz and Camenzuli abandoned their rights, if any, to the marks when Nonprofit became the exclusive user. The names of Lenaz and Camenzuli never appeared on any promotional materials, were not advertised when Nonprofit offered the relevant services to the public, were not used in Nonprofit's social media as either owners or assignors of the marks.

For all practical purposes, Lenaz and Camenzuli transferred any rights they had in the marks to Nonprofit–in keeping with the letter and spirit of Nonprofit's policies. The membership handbook, which Lenaz and Camenzuli developed, contains membership and waiver agreements that all members of Nonprofit, including Lenaz and Camenzuli, were required to sign each year, specifically stated, "I also agree that any artwork, dances and the intellectual property created by me or for use with the Disco Amigos becomes the property of Disco Amigos."[33]

ETDO was organized on January 15, 2015,[34] and its commercial endeavors were limited to soliciting and providing production services, such as renting the van, sound and lighting equipment, and the like.[35] The dancing, the performances at Mardi Gras and other events, were done only by Nonprofit's membership.[36] As far as the members of Nonprofit knew, ETDO was a

---

[31] Guercio, Transcript of Bench Trial, Day 2 [Doc. 106], p. 448, lines 2-13.
[32] 15 U.S.C. 1127.
[33] Exhs. 161 and 293, Membership Handbook's Waiver & Release of Liability.
[34] ETDO introduced copies of "paperwork" for formation in 2012. This paperwork was produced after the close of discovery and it was never registered with the Secretary of State. The feeble explanation for this oversight is based on the inability of Lenaz, Camenzuli, and Tiblier to figure out ownership of tangible assets – not intellectual property – of a potential entity. Lenaz, Transcript of Bench Trial, Day 2 [Doc. 106], p. 363, lines 8-20.
[35] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 45, lines 1-4; p. 50, lines 7-25; Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 588, lines 7-12.
[36] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 50, lines 7-25.

rental company that was used to supply the van and insure same.[37] The public had no information with which to think ETDO was the owner of the marks when the van carrying DISCO AMIGOS banners was rented and used by Nonprofit in parades and charitable events.

> ### a.   Evidence Shows Nonprofit Did Not Know About ETDO's Alleged Ownership.

The assignment allegedly executed on January 15, 2015 by Lenaz and Camenzuli was sent only to ETDO, in fact to Camenzuli's home address.[38] The document itself bears neither a witness nor a notary public signature. Over the past eight years, it was never introduced into the records of or verbal discussions at any Board meetings. Nonprofit was unaware of the existence of the document until this lawsuit was filed. The Board first learned about ETDO claiming ownership of the marks on August 21, 2019 when the Executive Committee, then comprised of Lenaz, Camenzuli, and Kim Janowski, presented the license agreement for Nonprofit to sign but without a basis.[39] In fact, the assignment and proposed license contradicted the provisions of Nonprofit's Waiver & Release of Liability by which all members, including Lenaz and Camenzuli, agreed to assign all intellectual property prepared for Nonprofit – to Nonprofit. It is no wonder that the news of Lenaz and Camenzuli claiming rights in the most prominent asset of Nonprofit caused a bitter split between the Executive Committee and the Nonprofit membership.

Ms. Denny Bro, a founding member of Nonprofit since 2012, with no pecuniary interest in this lawsuit, confirmed that in her many interactions with Lenaz and Camenzuli, they never stated that the marks belonged to them, individually, or to ETDO. This idea was not discussed at Board meetings that she attended as a founding member of the Board.[40] Ms. Bro testified that she

---

[37] Abernathy, Transcript of Bench Trial, Day 3 [Doc. 107], p. 547, line 10, through p. 548, line 5.
[38] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 47, lines 2-3.
[39] Rossi, Transcript of Bench Trial, Day 2 [Doc. 106], p. 321, line 25 through p. 322, line 4.
[40] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 499, lines 15-25.

could not believe it when she learned ETDO wanted to charge Nonprofit for the use of the marks after the members spent so much time and effort to make Disco Amigos a successful group.[41]

According to direct evidence, all members of Nonprofit were required to sign a Waiver & Release of Liability ever year.[42] A Board member usually organized signing of the agreements.[43] The agreements do not mention that Lenaz, Camenzuli, or ETDO allege ownership.[44] In fact, they state the artwork, choreography, and intellectual property belong to Nonprofit.

Mr. Tom Abernathy testified he first learned about the proposed license agreement in August or September 2019 when it was distributed to Nonprofit members. This was the first time that Nonprofit was presented with a demand to pay a licensing fee for the use of the marks.[45] According to the proposed license, Nonprofit would have to pay ETDO the majority of the funds created by membership dues; ETDO would have veto power over the Board; ETDO would control the events in which Nonprofit participated. In effect, it would have taken away all independent contributions that the members made to the organization.[46] As Mr. Abernathy testified, it would have given Lenaz and Camenzuli complete control over the group and added, "I wouldn't have wanted to be a part of a group that was run in that manner."[47]

Notably, the alleged assignment was not in the State Court Petition that Lenaz and Camenzuli filed one month before this cause even though it would be a proper way to allege an owner.[48] One of the most unbelievable statements made by Camenzuli was that he did not differentiate between an individual and a company ownership of an asset. As Camenzuli stated

---

[41] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 497, line 25, through p. 498, line 7.
[42] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 487, lines 10-11
[43] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 488, line 23 through p. 489, line 6.
[44] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 586, lines 5-24.
[45] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 608, lines 8-12.
[46] Abernathy, Transcript of Bench Trial, Day 3 [Doc. 107], p. 548, line 17 through p. 549, line 16.
[47] Abernathy, Transcript of Bench Trial, Day 3 [Doc. 107], p. 561, line 25 through p. 562, line 20.
[48] Exh. 311. It bears repeating that in the Petition, Lenaz and Camenzuli claimed to be the owners of the intellectual property, directly contradicting the position that they later took in this lawsuit and, of course, the evidence.

during trial of this cause, "I am ETDO."[49] His statement was made while his signature appears on the document allegedly assigning rights away from him, individually, to ETDO in 2015.

During trial, ETDO's testimony concentrated on the "Eureka" moments of Lenaz and Camenzuli in creating the marks. However, ETDO must show more than creation of the marks or the creators' desire to hold the world's largest disco party. Nonprofit, the second party whose expectations must be proven by ETDO, must be made aware of the rights claimed in the marks and agree to individual ownership by Nonprofit members Lenaz and Camenzuli of this most prominent asset of intangible property. Nonprofit members were not aware that Lenaz and Camenzuli held themselves in a different category from other members. As other members were required to assign their intellectual property rights to Nonprofit and provide voluntary services for the good of the entire organization, Lenaz and Camenzuli fancied themselves to be entitled to renumeration for their creation of the marks and believed they were free to transfer these rights to their own for-profit company, ETDO, depriving Nonprofit of its rightful property.

Nonprofit members invested time, talents, and energy in building up the goodwill of the marks without any compensation. As Ms. Angela McGurk testified, she personally invested countless hours in providing her uncompensated services to Nonprofit; up until 2020, she was making postcards for the "Disco Train" of Nonprofit.[50] Other Nonprofit members invested their energy and talents because they cared for the organization.[51]

The above demonstrates that ETDO failed to prove the first element of the ownership test established in *Lyons* because Nonprofit, the second party to the "expectations" prong, believed it was Nonprofit and its membership who owns the marks.

---

[49] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 68, lines 9-10.  Emphasis added.
[50] McGurk, Transcript of Bench Trial, Day 3 [Doc. 107], p. 523, lines 2-15.
[51] McGurk, Transcript of Bench Trial, Day 3 [Doc. 107], p. 523, lines 16-21.

   b.   **Evidence Shows the Public Identified Nonprofit as the Source of Services Offered Under the Marks.**

It is necessary to define "the public" in this case. First, current and past members of Nonprofit are a consumer as they pay dues to join Nonprofit and participate in its rehearsals and events. Members of Nonprofit are thus part of "the public," and it is clear that Nonprofit membership identifies Nonprofit, not ETDO, as the sources of services, as described above in Subsection a. But "the public" can be defined as to also include third parties contracting Nonprofit's services vs. EDTO's services, parade and event attendees, and other audiences, and the bulk of this section focuses on their perspective accordingly.

ETDO relied on Bruce Lin ("Lin") to prove use of the marks in dealings with third parties. As Lin testified, the American Diabetes Association ("ADA") "hired ETDO to come bring equipment, like speakers and the microphone and music and the van so that they had -- we could throw like an after-event party at one of these races. ... We brought the van, it was Mr. Lenaz and myself, and set up all the equipment and produced their party, got them a microphone."[52] It is clear that ETDO was hired by ADA only as a vendor to supply the production equipment.

Lin also testified that at the fundraiser for "Girls on the Run" in 2015, ETDO was asked "to bring audio equipment, like speakers, a microphone, and we also brought, used the van, the ETDO van to essentially set up and throw the after-party, play music, set up a dance party basically for the event."[53] Ms. Bro confirmed that the main focus in the event was providing dance troupes along the route. ETDO participated by providing sound equipment and DJ services[54] that were separate from Nonprofit.[55] Moreover, it was a one-time event for ETDO as

---

[52] Lin, Transcript of Bench Trial, Day 1 [Doc. 105], p. 169, lines 4-9.
[53] Lin, Transcript of Bench Trial, Day 1 [Doc. 105], p. 169, lines 10-15.
[54] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 493, line 21, through p. 294, line 10.

the next year they were not invited because of their high prices.[56] In other words, ETDO did not provide the relevant performance and educational services.

Kim Janowski ("Janowski"), on behalf of ETDO, confirmed the public only knew of Disco Amigos, Nonprofit, when seeing a performance. At trial, she testified:

Q. You mentioned to me earlier that the dance group was well-known in New Orleans?

A. Absolutely. Probably second behind 610 Stompers.

Q. That knowledge of the public was referring to Disco Amigos?

A. Correct, correct. Not any Non-Profit or for-profit umbrella over the Non-Profit, none of that. They knew the Disco Amigos. They knew the El Toro de Oro van with the bull, with the bull horns, and that was -- and the music, the disco music, that's what they knew.

Q. And they knew nothing about the ETDO issue?

A. Or Non-Profit 501(c)(7), no, they knew nothing of that.  And there would be no reason for the public to need to know that other than the fact that ETDO was El Toro de Oro and the van.[57]

Janowski also testified that "the public only knew Disco Amigos":

Q. Isn't it true that you and other members -- in fact, all the members worked hard to showcase the not-for-profit in a good light to the public?

A. To showcase the Disco Amigos, yes. The public, again, only knew Disco Amigos.[58]

Another ETDO witness, Mr. Marcel Gene Cambus, an officer of the Krewe of Carrollton, in charge of booking bands and dancing groups, testified that the Krewe of Carrolton engaged Nonprofit to perform as part of its Mardi Gras parade for a number of years. During that time, Camenzuli signed contracts on behalf of Nonprofit, and there was no mention of ETDO in

---

[55] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 494, lines 17-25.
[56] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 495, lines 3-8.
[57] Janowski, Transcript of Bench Trial, Day 1 [Doc. 105], p. 150, line 17, through p. 151, line 7.
[58] Janowski, Transcript of Bench Trial, Day 1 [Doc. 105], p. 135, lines 21-25.

contracts with that Krewe.[59] According to Ms. Michele Rossi, when the general public sees the term DISCO AMIGOS displayed, the public thinks it refers to the Disco Amigos club, Nonprofit.[60] Whenever a DISCO AMIGOS performance is made or requested, the public associates this name with the club, Nonprofit; when the public praises the Disco Amigos club, it refers to Nonprofit.[61]

Direct evidence indicates that neither ETDO, nor Lenaz, nor Camenzuli's names appeared in any publications available to Nonprofit members or the public. Ms. McGurk, Nonprofit member from 2015 to 2019, who handled all of the marketing and communications design work for Nonprofit during 2015-2017, including the membership handbook and marketing materials, testified that she submitted these materials to Lenaz and Camenzuli; that during her work with Nonprofit, she was not aware of ETDO; and that if ETDO were a presence in the public, there would have been public materials that she would have created that referenced ETDO. There were none. As Ms. McGurk stated, "So the public has no clue what ETDO is. Most of the members had no clue what ETDO is."[62] Ms. McGurk also indicated that every piece of material, internal or external, that she had touched and personally created and designed, including the membership handbook, did not reference ETDO, did not reference a copyright, did not reference anything linked to ETDO. That included posters, postcards, e-mails, all of social media graphics, membership manual, anything that the members had their hands on.[63] Even the latest, 2017 publication of the Membership Agreement, makes no mention of ETDO.[64]

---

[59] Cambus, Transcript of Bench Trial, Day 1 [Doc. 105], p. 233, lines 17-25.
[60] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 590, lines 3-22.
[61] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 591, lines 1-19.
[62] McGurk, Transcript of Bench Trial, Day 3 [Doc. 107], p. 522, lines 3-10.
[63] McGurk, Transcript of Bench Trial, Day 3 [Doc. 107], p. 522, lines 14-21; p. 526, lines 2-9.
[64] McGurk, Transcript of Bench Trial, Day 3 [Doc. 107], p. 534, line 17, through p. 535, line 12.

At trial, ETDO was unable to show that the most public forum of Nonprofit, the Disco Amigos website, makes any reference to either ETDO, Lenaz, or Camenzuli. Lin, the creator of the website, a member of Nonprofit and co-owner of ETDO, could not positively identify any page or content on the website that would mention any of the "founders" or ETDO.[65] Similarly, Lin was unable to positively state that the Disco Amigos webpage carried ETDO's copyright notice.[66]

The implication is simple – neither Lenaz, Camenzuli, nor ETDO have ever provided public notice of their alleged ownership and control over the marks or Nonprofit's operations. Consequently, none of the evidence presented by ETDO can establish public association of the marks with either ETDO, or Lenaz, or Camenzuli. The evidence demonstrates that the public identified only Nonprofit as the source of services under the marks. ETDO did not and could not meet the second prong of *Lyons* – who the public associates with the marks.

      c.    **Evidence Demonstrates It Was Nonprofit Who Stood Behind the Quality of Services Offered Under the Marks.**

At trial, ETDO suggested that it controlled the quality of services offered under the marks through Lenaz and Camenzuli's membership on the Executive Committee. However, according to the Nonprofit's Bylaws, the Board has the authority to manage ALL affairs of Nonprofit.[67] The Bylaws,[68] Membership Agreement,[69] and waiver, release, and indemnity documents[70] are the main documents governing operation of Nonprofit.[71] The Board is responsible for all policies, procedures, and any revisions to those.[72]

---

[65] Lin, Transcript of Bench Trial, Day 1 [Doc. 105], p. 178, line 16, through p. 179, line 1.
[66] Lin, Transcript of Bench Trial, Day 1 [Doc. 105], p. 179, lines 9-23.
[67] Exhs. 352 and 11, para.7.4.1; Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 58, lines 22-24.
[68] Exhs. 352 (updated Bylaws) and 11 (old Bylaws).
[69] E.g., Exh. 12.
[70] E.g., Exhs. 161 and 293.
[71] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 581, line 25, through p. 582, 1-21.
[72] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 582, line 22, through p. 583, line 1.

Lenaz and Camenzuli served on the Executive Committee. To become a member of the Executive Committee, a member of Nonprofit has to first be nominated and elected to the Board by the membership, to serve on the Board for one year, and only then qualified to be nominated from the Board members to the Executive Committee.[73]

That said, all Committees of Nonprofit report to the Board.[74] The Board entered into agreements with Mardi Gras Krewes.[75] As Mr. Abernathy testified during trial, he, as the chairman of the Mardi Gras Committee, reported to a particular Board member who was also a member of the Committee, and reported to the Board during Board meetings. The Board had the authority to approve or disapprove actions of the Committee.[76]

Under Louisiana law, a corporation's board of directors wields power on behalf of the owners and controls the corporation's agents and its officers. With all corporate power vested in the board, officers have authority to act only to the extent their power is conferred by charter, bylaw, or resolution. The president of a corporation serves at the pleasure of the board, not the other way around.[77]

The Executive Committee, even including "founders," still had to answer to Nonprofit's governing body, the Board, and was bound by the Board's voting power and the provisions of its organizing documents. Nonprofit's Bylaws establish that the Board is the governing body of Nonprofit; only the Board can dissolve the organization; the Board can establish policy, create Committees, incur debt, borrow money, modify the Membership Agreement, etc.[78] The Executive Committee has no power granted to it by the Bylaws to dissolve the Board.[79]

---

[73] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 56, lines 7-12.
[74] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 74, line 19, through p. 75, line 8.
[75] Abernathy, Transcript of Bench Trial, Day 3 [Doc. 107], p. 550, lines 13-21; Exhs. 71, 85, 87.
[76] Abernathy, Transcript of Bench Trial, Day 3 [Doc. 107], p. 543, line, through p. 545, line 14.
[77] *In re New Orleans Paddlewheels, Inc.*, 350 B.R. 667 (2006).
[78] Rossi, Transcript of Bench Trial, Day 2 [Doc. 106], p. 329, line 19, through p. 330, line 9.
[79] Exhs. 352 and 11, Bylaws, Section 8.

Based on the Nonprofit history of operations and Nonprofit's Bylaws, it is clear that its Board reserved for itself, and routinely exercised, its right to approve all new expenditures, events' participation, uniforms, and choreography, amend governing documents, make decisions in Nonprofit's interactions with third parties, manage Nonprofit's public exposure, and adopt other quality control measures. Nonprofit is a Board-governed organization, where no single member can own Nonprofit property, e.g. the marks at issue, or control operations of the entity.

Such organizational scheme destroys ETDO's arguments asserting that individuals of the Executive Committee controlled operations of Nonprofit, controlled quality of services offered to the public under the marks, or owned assets of Nonprofit in their individual capacities. In fact, it is the Board, similar to a legislative branch, who establishes the rules, makes the management decisions, and empowers the Executive Committee to perform the tasks approved by the Board.

Direct evidence presented at trial confirms these facts. Mr. Abernathy testified that the Board controlled the quality of performance provided by Nonprofit. Committees took their ideas or explained their concepts for the show, the look, the feel, and the music – and presented it all to the Board for approval before it was executed by Nonprofit.[80] Mr. Abernathy also confirmed that the general public looked to Nonprofit as the provider of services: the group's name was Disco Amigos, that's who was parading and that's who was "putting on the show." [81]

Ms. Bro confirmed that the Membership Agreement requires the written consent of the Board to use the logo, images, video, likeness of Disco Amigos. Nowhere does it indicate that ETDO, Lenaz, or Camenzuli must give a written consent.[82] Ms. Bro also testified that as a chair of the Uniform Committee within the Board, she reported directly to the Board.[83]

---

[80] Abernathy, Transcript of Bench Trial, Day 3 [Doc. 107], p. 554, lines 6-11.
[81] Abernathy, Transcript of Bench Trial, Day 3 [Doc. 107], p. 554, lines 13-20.
[82] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 489, lines 15-21.
[83] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 491, lines 10-12.

Ms. Rossi, current President of Nonprofit and Board member, testified that the Board was active in helping develop the Committees, and giving them direction on carrying out Nonprofit's mission and goals. The Board would give the Committees the tools to grow the organization, whether it be through obtaining events, growing membership, Mardi Gras parades, etc. The Board also reviewed any policies and procedures. The Board's duties included approval of the budget, any capital purchases, and any expenditures on large equipment.[84] As a member of the Executive Committee, Ms. Rossi testified, she reports to the Board, making sure the membership and the Committees follow the stated mission, and that the Nonprofit follows IRS regulations.[85]

Such testimony proves that it is Nonprofit and its Board that controls the quality of services provided under the marks and the conduct of members in relation to Nonprofit's marks, as well as ensuring that the intellectual property created within the framework of Nonprofit activities belongs to Nonprofit. As with elements one and two, ETDO failed to prove element three of ownership indicia set forth in the *Lyons* case – the understanding of the general public of who stands behind the services offered under the marks.

### d.    Nonprofit Continues Its Services Even After Members of ETDO Left.

Notably, the public continues to engage Nonprofit for performances after the split with Lenaz and Camenzuli. Ms. Bro testified that Nonprofit participated in at least five events after the split: Krewe of Boo in October 2019; Hustle for Health, Baton Rouge General Hospital in October 2019; and Nyx, Cleopatra, and King Arthur parades in 2020.[86] The continued use is an important indicator of the public recognition of the source of services offered under the marks.

---

[84] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 584, lines 5-15.
[85] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 584, lines 16-24.
[86] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 498, lines 17 – 25 through p. 499, lines 1 - 12

### e.   Nonprofit Membership Was Not Aware of Any "Implied License."

ETDO suggested that there had existed an "implied license" for use of the marks between Lenaz/Camenzuli and Nonprofit. However, ETDO's witnesses were unable to produce any evidence demonstrating an "implied license" or document signed by both parties indicating any license, nor point out where in the Board's Minutes of Meetings an implied license was discussed. According to witness testimony, the only people who were aware of a license were the alleged licensors, Lenaz and Camenzuli.[87] Neither the full Board nor the Nonprofit members received any notification, written or verbal, stating that they were licensees, under a non-exclusive revocable implied license from Lenaz and Camenzuli, to operate under the marks.

### B.   Lenaz and Camenzuli Breached Their Fiduciary Duties of Care and Loyalty.

In *Noe v. Roussel*, 310 So.2d 806 (La. 1975), the Louisiana Supreme Court stated:

> An agent who acquires his principal's property or one who otherwise acts in a fiduciary capacity bears the burden of establishing that the transaction was an arms-length affair. This means that the agent or fiduciary must handle the manner as though it were his own affair. It also means that the agent or fiduciary may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights of his principal against all other persons whom so ever, and is bound not to act with antagonism, opposition or conflict with the interest of the principal to even the slightest extent.

Evidence shows that Lenaz and Camenzuli, Nonprofit's agents, violated the letter and the spirit of Louisiana law by the actions that were clearly contrary to the interests of Nonprofit—where at the very least they allegedly transferred intellectual property of Nonprofit to their own for-profit company, ETDO.

Also, Lenaz and Camenzuli attempted to voluntarily transfer substantially all of the Nonprofit assets in violation of La. R.S. 12:247. If the company is not insolvent, only a vote by 2/3 of the members can transfer the assets of Nonprofit. La. R.S. 12:247(B) details the procedure

---

[87] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 72, line 10, through p. 73, line 23.

that must be followed to affect such transfer, including a meeting of all voting members following a proper notice. Neither ETDO, nor Lenaz, nor Camenzuli took the necessary steps to comply with the statute. Instead, they sought to dissolve the Board in the State Court lawsuit.

Next, it is notable that Lenaz and Camenzuli refused in their capacity as Executive Committee members to acquire Directors & Officers insurance for Nonprofit just before the controversy existed, but then of course has since sued Nonprofit and its Board members for acting in the best interest of the Nonprofit and in accordance with the Bylaws and Agreements.

### a.   ETDO Owners/Nonprofit Members Had Clear Conflict of Interest.

ETDO members failed to follow requirements of La. R.S. 12:228. Nonprofit's contracts with ETDO directly benefited owners of ETDO who were also serving as officers of Nonprofit.

Throughout his testimony, Camenzuli repeated that he was "ETDO," that he owned it and consequently did not need to take the steps necessary to differentiate his roles as the owner of for-profit ETDO and as Executive Committee member of Nonprofit. According to Camenzuli's understanding, the Executive Committee reports only to the Executive Committee.[88] Also according to Camenzuli, he owns ETDO; he is ETDO.[89] It is not surprising that he treated the account of Nonprofit as that of ETDO when writing checks to ETDO from Nonprofit.[90]

It is not surprising then, that one of the Board members, Mr. Roy Guercio, a public accountant, resigned from the Board after discovering conflicts in ETDO's dealings with Nonprofit.[91] In the detailed explanation from Mr. Guercio, he was concerned about the

---

[88] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 75, lines 9-11.
[89] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 68, line 24, through p. 69, line 1.
[90] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 87, lines 20-22.
[91] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 97, line 17, through p. 99, line 1.

accounting practices of the Executive Committee that included Lenaz and Camenzuli of ETDO, stating it looked like "it's Jerry contracting with Jerry, or Francois contracting with Francois."[92]

### b.      Lenaz and Camenzuli Made Unauthorized Payments to ETDO.

Camenzuli admitted that he wrote two unauthorized checks from Nonprofit's account to ETDO to cover ETDO's expenses.[93] However, he never advised the Board of his actions even though they were admittedly incorrect. The evidence of the breach of fiduciary duties was in ETDO's control during discovery but was never produced when requested. Although ETDO's expert mentioned the unauthorized checks in his report,[94] Nonprofit had to subpoena bank records to obtain copies of the checks received after the close of discovery.

According to ETDO, in the fall of 2018, the El Toro De Oro van died, its engine blown.[95] ETDO, the rental company that owned that van, was still under contract with Nonprofit to provide sound and light equipment carried by the van. Executive Committee member Janowski, an ETDO agent, found a replacement, and the money to replace the van, $13,000, was taken from Nonprofit's account. According to Janowski, this money was owed to ETDO "for services, to supply equipment, the intellectual property, and protect the liability."[96] These facts prove that without knowledge or consent of the Board, ETDO owners charged Nonprofit for the intellectual property even though no provision outlining such payments was included in the production services agreement between Nonprofit and ETDO. In other words, ETDO owners chose to compensate themselves for the use of intellectual property without the Board's approval or consent. Such actions violate Lenaz and Camenzuli's fiduciary duties as officers of Nonprofit and demonstrate disregard for the duties of care and loyalty owed to Nonprofit.

---

[92] Guercio Transcript of Bench Trial, Day 2 [Doc. 106], p. 462, lines 20-21.
[93] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 92, lines 18-25.
[94] Doc. 92-1.
[95] Janowski, Transcript of Bench Trial, Day 1 [Doc. 105], p. 122, lines 21-22.
[96] Janowski, Transcript of Bench Trial, Day 1 [Doc. 105], p. 124, lines 9-2.  Emphasis added.

This was not the only event indicating self-dealing by the ETDO owners. There were payments made from Nonprofit's account to ETDO that even ETDO's witness, Mr. Luby, conceded should not have been made. These payments demonstrated clear conflict of interest of Lenaz and Camenzuli, then-active members of Nonprofit's Executive Committee and owners of ETDO.[97] These transfers of funds were made without approval of Nonprofit's Board, and without conflict of interest waivers or any other similar safeguards in place.

Ms. Bro testified that in her view, the Disco Amigos Social Aid and Pleasure Club was not to be for profit, stating, "We want to be available for charities that need someone to come and be their entertainment, and we do it for free."[98] ETDO however has received payments from third-party contracts requiring ETDO to provide sound and light equipment, and including an added fee for Nonprofit to perform.[99] Ms. Bro testified that she was not aware that ETDO charged fees for Nonprofit's performances.[100] Nonprofit did not receive any portion of these payments under these contracts. However, Nonprofit was required to pay ETDO for production services even when, without Nonprofit's knowledge, ETDO was also being paid by the customer for the same production services at events where Nonprofit members were performing for free.

Mr. Guercio also disagreed with ETDO's expert and indicated that ETDO owed over $20,000 to Nonprofit.[101]

### c.    Nonprofit Members Were Locked Out of Their Online Accounts.

Even though certain online accounts belonged to Nonprofit, ETDO, Lenaz, and Camenzuli unlawfully locked other Nonprofit members from access to them at the outset of the controversy, thus severely hampering operations of Nonprofit. One example is the Google Drive

---

[97] Luby, Transcript of Bench Trial, Day 2 [Doc. 106], p. 262, line 10, through p. 266, line 5.
[98] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 498, lines 8-16.  Emphasis added.
[99] Lenaz, Transcript of Bench Trial, Day 2 [Doc. 106] p. 379, lines 2-8.
[100] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 496, line 23, through p. 497, line 5.
[101] Guercio Transcript of Bench Trial, Day 2 [Doc. 106], p. 454, line 2.

containing most corporate information of Nonprofit. As Mr. Abernathy testified, he could not see previous years' Mardi Gras information because he was locked out of that account.[102]

### d.     Counter-Defendants Interfered with Nonprofit's Operations.

Mr. Cambus testified that Nonprofit did not participate in the Krewe of Carrollton parade in 2020 because Lenaz sent an e-mail on behalf of himself and Camenzuli, signing it as President and co-founder of Nonprofit, and stating that Nonprofit would not be able to participate in the parade.[103]   The stated reason – conflict over the trademarks.

ETDO also falsely claimed that it "handled" Nonprofit. Unbeknownst to Nonprofit membership, ETDO charged appearance fees for performances by Nonprofit members. This was contrary to the stated purposes and long-established practice of Nonprofit that provided voluntary services to the public while participating in charitable events. According to Ms. Bro, she would have never joined Nonprofit had she known about it. Ms. Bro testified that she was totally amazed when she learned of that fact.[104] Mr. Abernathy also testified that he had joined the organization believing it was for charitable purposes, and that he would not have become a member had he known that Lenaz, Camenzuli, or ETDO would claim ownership of the marks.[105]

After members of ETDO left Nonprofit, ETDO participated in the Krewe of Tucks in 2020 under the name "Disco Amigos Enterprises," therefore unfairly competing with Nonprofit and infringing on Nonprofit's marks. At this event, ETDO, Lenaz, and Camenzuli called it "The Last Dance."[106] The walking group did not perform show-like choreographed dances for which

---

[102] Abernathy, Transcript of Bench Trial, Day 3 [Doc. 107], p. 552, lines 10-20.
[103] Exh. 266; Cambus Transcript of Bench Trial, Day 1 [Doc. 105], p. 233, lines 1-25.
[104] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 497, lines 6-21.
[105] Abernathy, Transcript of Bench Trial, Day 3 [Doc. 107] p. 548, lines 10-16; *see also* Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 587, lines 4-21.
[106] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 91, lines 1-4; Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 598, lines 1-21.

the Nonprofit is well-known in previous parades, including Krewe of Tucks, and that appearance by ETDO was injurious to Nonprofit's reputation as a performance dance krewe.[107]

### e.    The License Agreement Would Financially Cripple Nonprofit.

At the August 21, 2019 Board meeting, Lenaz and Camenzuli presented the license agreement demanding that the Board sign the agreement allowing Nonprofit to continue using the marks that it had been using for more than seven consecutive years. In that proposed license, in addition to the demand for acknowledgment of ETDO's ownership of the marks, Lenaz and Camenzuli required that ETDO be paid 80% of Nonprofit's membership dues, 80% of revenue from two particular Mardi Gras events and 50% from other Mardi Gras events, 80% of merchandising revenue, and 20% of any special designs Nonprofit created. Realizing that a license was not needed and that such unfair license would financially destroy Nonprofit, the Board refused.[108] The split of Nonprofit and two lawsuits followed soon thereafter.

### f.    Letter of Intent Falsely Represented that ETDO Owns the Marks.

In the fall of 2015, Ms. Tonya Dennis of Birmingham, AL, joined the Nonprofit as a performer. She took part in some of the events in New Orleans and later made inquiries about starting a chapter of Nonprofit in Birmingham. Although a chapter never organized, Ms. Dennis had signed and sent a letter of intent to Lenaz[109] but Lenaz then added text on the bottom of the letter of intent after Ms. Dennis signed,[110] where Lenaz falsely asserted ownership of the marks in violation of the Membership Agreement and other governing documents of Nonprofit.[111]

---

[107] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 598, line 22, through p. 599, line 23.
[108] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 595, line 15, through p. 596, line 14.
[109] Dennis, Transcript of Bench Trial, Day 3 [Doc. 107], p. 581, lines 3-8; Trial Ex. 261.
[110] Dennis, Transcript of Bench Trial, Day 3 [Doc. 107], p. 572, lines 10-25
[111] Also, Lenaz and Camenzuli had called Ms. Dennis requiring that the Birmingham group sign a license agreement with them quickly. Dennis, Transcript of Bench Trial, Day 3 [Doc. 107], p. 571, lines 16-23.

### C.      Nonprofit Is Entitled to Damages and Attorneys' Fees.

The foregoing described testimony and evidence presented at trial establishes that Counter-Defendants: (1) unfairly compete with Nonprofit, passing off and advertising under the marks in violation of 15 U.S.C. 1125(a); (2) unfairly compete with Nonprofit and falsely advertise as being the rightful owners and users of the marks in violation of La. R.S. 51:1409 and 51:411; (3) negligently interfere with Nonprofit's established business relations in violation of La. C.C. art. 2315; and (4) Lenaz and Camenzuli, individually, breached their fiduciary duties of loyalty and care that they owed as Board members of Nonprofit.

Nonprofit is therefore entitled to judgment on its claims and remedies under 15 U.S.C. 1117 for ETDO, Lenaz, and Camenzuli's profits; any damages sustained by Nonprofit; and costs of this action, including attorneys' fees. Also, the evidence demonstrated that willful actions of ETDO, Lenaz, and Camenzuli justify designation of this case being exceptional thus qualifying for treble-damages in favor of Nonprofit.

### CONCLUSION

The evidence and law show that ETDO failed to prove infringement, unfair competition, or the marks' ownership. Conversely, Nonprofit is entitled to judgment against ETDO, Lenaz, and Camenzuli on its counterclaims for unfair competition, specifically passing off and false advertising, for injury to business reputation, for negligent interference, and for breach of fiduciary duties of care and loyalty. Nonprofit is entitled to remedies pursuant to 15 U.S.C. 1117, including costs of this action and attorneys' fees, as well as treble damages for willful acts of ETDO, Lenaz, and Camenzuli and any other damages that the Court deems just and proper.

**RESPECTFULLY SUBMITTED** this 13th day of November 2020.

/s/ *Thomas S. Keaty*
Thomas S. Keaty (#7666) – TA
KEATY LAW FIRM LLC
365 Canal Street, Suite 2410
New Orleans, Louisiana 70130
(504) 524-2100
tskeaty@keatypatentfirm.com

-and-

/s/ *Steven M. Hannan*
Steven M. Hannan (#33878)
Hannan, Giusti & Hannan L.L.P.
2201 Ridgelake Drive
Metairie, Louisiana 70001
(504) 831-5300
steven@hghlaw.com

*Attorneys for ALFREDO CRUZ, MICHELE ROSSI, MICHELE HUDACK, MARISA NAQUIN, SONYA BOURGEOIS, LISETTE BAYLE, RENEE PASTOR and DISCO AMIGOS SOCIAL AID AND PLEASURE CLUB*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 13, 2020 a copy of the above and foregoing DEFENDANTS' POST-TRIAL MEMORANDUM was served upon all known counsel of record via the Court's CM/ECF electronic filing system.

By: /s/ *Thomas S. Keaty*
**THOMAS S. KEATY**