# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ETDO PRODUCTIONS, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**ALFREDO CRUZ, ET AL.**<br><br>Defendants.<br><br>**DISCO AMIGOS SOCIAL AID AND PLEASURE CLUB,**<br><br>Counterclaimant,<br><br>v.<br><br>**ETDO PRODUCTIONS, LLC, ET AL.**<br><br>Counter-Defendants. | **CIVIL ACTION NO. 19-CV-13184-ILRL-DMD**<br><br>**JUDGE IVAN L.R. LEMELLE**<br><br>**MAGISTRATE JUDGE DANA M. DOUGLAS** |

## DEFENDANTS' REPLY TO PLAINTIFF'S POST-TRIAL MEMORANDUM

Defendant-Counterclaimant Disco Amigos Social Aid and Pleasure Club ("Nonprofit") and Defendants Alfredo Cruz, Michele Rossi, Michele Hudak, Marisa Naquin, Sonya Bourgeois, Lisette Bayle, and Renee Pastor (collectively "Defendants"), by and through their attorneys, respectfully submit this reply brief to the post trial memorandum [Doc. 110] of Plaintiff-Counter-Defendant ETDO Productions, LLC ("ETDO") and Counter-Defendants Jerry Lenaz ("Lenaz") and Francois Camenzuli ("Camenzuli") (collectively "Plaintiff").

Most of Plaintiff's lengthy post-trial brief, as is most of the testimony of Plaintiff's witnesses at trial, is consumed with the desperate attempt to establish ownership of the DISCO AMIGOS marks based on a late-2011/early-2012 use of the El Toro De Oro van playing disco music. However, the use of the van, *per se*, does not establish *bona fide* first use of the marks in

-1-

commerce. The rental of the van, even with bull horns and a nose ring, similarly, does not establish *bona fide* use of the marks in commerce in relation to the relevant services – performances and classes. Making token uses of the marks in early 2012 too, does not demonstrate a continuous use of the marks in commerce.[1] Ultimately, Plaintiff cannot avoid the fact that it was Nonprofit who continuously provided the relevant services in commerce, as defined by the Lanham Act, under the marks. It was the Board of Directors ("Board") of Nonprofit who exercised control over the quality of services provided under the marks; and it is Nonprofit who is identified under the marks as the source of the relevant services in the minds of the purchasing public. Therefore, it is Nonprofit that is the owner of the marks; and so, Plaintiff's claims against Nonprofit should be dismissed with prejudice, and Nonprofit's counterclaims – granted.

Furthermore, Plaintiff failed to demonstrate any wrongdoing by the individual Defendants, Cruz, Rossi, Hudak, Naquin, Bourgeois, Bayle, and Pastor. Accordingly, Plaintiff's claims against the individual Defendants should be dismissed with prejudice.

1. **Plaintiff Offers No Convincing Support For Their Interpretation Of Trademark Law.**

Plaintiff spends a considerable time in their brief again retelling the "story of creation" of the marks and the few instances when Lenaz and Camenzuli advertised formation of the new club, Nonprofit.[2] Defendants do not dispute this story of creation, but it is axiomatic in trademark law

---

[1] Plaintiff erroneously implies that they hired a choreographer prior to Nonprofit's incorporation. Doc. 110, p. 11. In fact, no documents or testimony corroborates this statement. The photograph indeed includes Ms. Lauren Leitner, who was a choreographer of Nonprofit, but there is no evidence to suggest that Plaintiff paid Ms. Leitner for her services.

[2] Plaintiff repeatedly mentions Camenzuli purchasing t-shirts with the DISCO AMIGOS name and logo on May 2, 2012 and selling the shirts to individuals prior to creation of Nonprofit. However, Plaintiff's Trial Exh. 267 shows that the shirts were not scheduled to arrive until May 16, 2012, which proves that Camenzuli could not have sold the shirts prior to formation of Nonprofit (also May 16, 2012). Regardless, such use on the shirts was decorative and ornamental, and clearly no party to this lawsuit is a manufacturer, a "source," of shirts, and therefore does not confer any trademark rights absent identifying services of a "secondary source." *See* TMEP 1202.03(c). Here, the secondary source would have been Nonprofit.

that token use does not confer any trademark rights. Instead, the use must be sufficient to meet the requirements of *bona fide* use in commerce in the ordinary course of business.[3]

Plaintiff erroneously suggests that "this faction group [Defendants] acted unilaterally knowing there was not a written agreement in place to indicate they had the right to use the brand they concede was created and used in commerce by Lenaz, Camenzuli and ETDO for eight years."[4] The only facts that Defendants acknowledge are that Lenaz and Camenzuli designed the logo and came up with the moniker, respectively. Absence of the written license agreement is strong evidence that no such agreement existed. Also, Defendants assert that it was only Nonprofit who has continuously used the marks in relation to the relevant services since 2012, and no permission to continue using the marks was required. It is only through continuous *bona fide* use in commerce by Nonprofit in providing performance and educational services for eight consecutive years that trademark rights and goodwill associated with the DISCO AMIGOS marks came into existence.

None of the examples offered by Plaintiff of their post-2015 alleged exclusive, to the benefit of Plaintiff only, use of the marks in commerce qualify under 15 U.S.C. § 1127. One of these alleged examples of exclusivity was a birthday party for Kira Hess [Trial Exh. 36]. However, Lenaz advised just the opposite – that <u>Disco Amigos</u> was also getting paid for the performance – in an e-mail to Nonprofit performers: "This is a paying gig <u>for both the Disco Amigos and ETDO Productions</u>," and "This is a paid event, so we expect everyone to act professional."[5] The e-mail did not state that "ETDO is getting paid for Disco Amigos' performance at the birthday party." In fact, there is no e-mail that was produced during or after discovery that would show that Plaintiff ever told Nonprofit performers that ETDO was getting paid for Nonprofit's services.

---

[3] *See* 15 U.S.C. § 1127.
[4] Doc. 110, p. 21.
[5] Trial Exh. 36, pp. 13-14.

-3-

Plaintiff also suggests that ETDO had paid gigs that did not involve Nonprofit's services.[6] The truth is that Nonprofit did not know any of this until the documents were produced in discovery in this case. Moreover, Nonprofit was not copied on any of these documents, including e-mails with the organizations by whom ETDO was getting paid even when Nonprofit members did provide performances.

### 2. ETDO-JV Existed Only In The Minds Of ETDO Members.

The intended purpose of the alleged ETDO-JV is of no importance where only three people were aware of that intent – Lenaz, Camenzuli, and Tiblier. Nothing in Nonprofit records or in Plaintiff's witnesses' testimony could point to the knowledge by Nonprofit members of any "umbrella" entity responsible for controlling quality of services offered under the marks.[7] In fact, Lenaz and Camenzuli could not point out the language in Nonprofit's Bylaws or membership documents where their alleged intentions were referenced. Plaintiff's suggestions that Trial Exhs. 229 & 300 (allegedly evidencing that Nonprofit was an entertainment group for ETDO) are "both ETDO and Disco Amigos" business records are erroneous. These documents are highly suspicious, as they were produced after the close of discovery and introduced over Nonprofit's objections.

Also erroneous is Plaintiff's suggestion that ETDO-JV allowed Nonprofit to use the van "at all the Mardi Gras parades at no cost to the Nonprofit despite the fact that it cost ETDO-JV members to provide use of the van and its associated production equipment."[8] To the contrary, Mr. Roy Guercio testified that in his review of ETDO subpoenaed bank records, he saw two deposits of two checks written from Nonprofit's account and deposited into ETDO's account, both on

---

[6] Doc. 110, p. 22.
[7] Janowski, Transcript of Bench Trial, Day 1 [Doc. 105], p. 150, ln. 17 through p. 151, ln. 7. Janowski, member of Lenaz- Camenzuli6-led faction, was the only person who referred to Lenaz and Camenzuli as "founding fathers."
[8] Doc. 110, pp. 18-19.

January 29, 2015 (right after ETDO opened its bank account), for repayment of use of equipment for 2014 and 2015 Mardi Gras parades (in amounts of $1,600 and $1,500, respectively).[9]

As to Nonprofit control, its Bylaws expressly states the Board is vested with the decision-making power in ALL affairs of Nonprofit.[10] Live testimony confirmed that all Committees of Nonprofit reported directly to the Board, not to the Executive Committee.[11] It was the Board who controlled quality of services provided under the marks, not the Executive Committee.

Plaintiff suggested that ETDO-JV was formed to protect the Nonprofit membership from liability claims. However, buying vehicle insurance for the van in no way protects the Nonprofit membership nor the Board from general liability.[12] In fact, Nonprofit always paid for its own general liability insurance out of Nonprofit's own bank account. ETDO never paid for Nonprofit's general liability insurance. ETDO was responsible for purchasing its own insurance for the van but at one point, actually used Nonprofit's funds to pay a premium and never reimbursed Nonprofit. Mr. Robert Luby's report identifies this improper use of Nonprofit's funds by Plaintiff. Even further, Lenaz and Camenzuli resisted Nonprofit's efforts to buy Directors' and Officers' insurance before the controversy existed, and yet are now suing the individual Board members.

**3. The Alleged "Implied License" Did Not Exist.**

The direct testimony of witnesses confirms that the alleged "licensees" were totally unaware of any limitations on their use of the marks or any rights that the "creators" retained for themselves.[13] Nonprofit members invested countless hours in the development and promotion of

---

[9] Guercio, Transcript of Bench Trial, Day 2 [Doc. 106], p. 454, lns. 7-15, 20-14; p. 455, lns. 1-7; p. 456, lns. 14-16, lns. 21-25; and p. 457, lns. 1-7.
[10] Trial Exh. 352, para. 7.4.1; Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 58, lns. 22-24.
[11] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 74, ln. 19 through p. 75, ln. 8.
[11] Abernathy, Transcript of Bench Trial, Day 3 [Doc. 107], p. 550, lns. 13-21; p. 543, ln. 2 through p. 545, ln. 14; and Trial Exhs. 71, 85, 87.
[12] Doc. 110, p. 15; Janowski, Transcript of Bench Trial, Day 1 [Doc. 105], p. 104, lns. 12-17.
[13] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 72, ln. 10 through p. 73, ln. 23.

the marks and goodwill associated with the marks for the benefit of Nonprofit, and they would not have done so had they known that Lenaz and Camenzuli would claim ownership of the marks.[14]

By suggesting that Defendants' witnesses could not identify any documents that would evidence ownership of the intellectual property by Nonprofit, Plaintiff attempts to shift its own burden of proof of trademark ownership to Defendants. On the other hand, Nonprofit offered ample testimony to support its claim trademark ownership through continuous *bona fide* use of the marks in commerce in the ordinary course of business.

Plaintiff erroneously relies on *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.,* 128 F.3d 872 (5th Cir. 1997) for a proposition that "under federal law, a nonexclusive license may be granted orally, or may even be implied from conduct." The *Lulirama* case however was related to copyright law with work-for-hire implications. It also identified several instances when an implied nonexclusive license arises: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work."[15] None of these facts are present in the instant case – Lenaz and Camenzuli did not create the marks based on a contract, they did not deliver their work as part of the contract, and there was never an expectation that Nonprofit would copy and distribute their work. Besides, the *Lulirama* court also held that a nonexclusive license is not revocable at will of licensor (illusory contract).[16]

---

[14] Abernathy, Transcript of Bench Trial, Day 3 [Doc. 107], p. 548, lns. 10-16; Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 587, lns. 4-21.

[15] *Id.* at 879. (citations omitted).

[16] *Id*. at 882 ("Lulirama's argument that it revoked any implied license that might have arisen by filing the present lawsuit is tantamount to an argument that it had a unilateral right of rescission without notice — an argument entirely inconsistent with the existence of a contract between the parties. If Lulirama had the ability to terminate the license at will, then no contract could exist because Lulirama's obligation under the contract would be illusory.").

Instead, the case at bar is not unlike *LimeCoral, Ltd. v. CareerBuilder, LLC,* 889 F.3d 847 (7th Cir. 2018), where a creator laid in wait for many years in anticipation for a big pay day from the "implied licensee," CareerBuilder, who could not by that time operate without the work. The court in *LimeCoral* found that the creator was attempting to gain an unfair benefit from the relationship it formed with CareerBuilder, which is part of the purpose in the law for the implied license. The implied license is intended to prevent a creator from providing a work for use and then waiting until the recipient cannot feasibly complete its business without the work. Such a result would effectively allow the creator to hold the recipient hostage and extract an unjust benefit from the recipient because at some point in a project it would be too costly for the recipient to find another party to create the needed work. LimeCoral did not produce any evidence that would enable a reasonable trier of fact to conclude anything other than that LimeCoral laid in wait for years and years in anticipation of a big pay day either by obtaining a judgment against CareerBuilder in litigation or by extorting a settlement from CareerBuilder.

The same is true here. Even accepting, *arguendo*, that there existed an "implied license," the Court should not reward the ambush tactics of Lenaz and Camenzuli in demanding royalty payment seven years after Nonprofit incorporation.

**4. The Alleged Assignment Does Not Qualify As *Prima Facie* Evidence Of The Transfer Of Trademark Rights To ETDO.**

Plaintiff relies on the alleged assignment that apparently transferred intellectual property rights of Lenaz and Camenzuli to their own for-profit company, ETDO. However, not only would such an assignment be a violation of the fiduciary duties by then Nonprofit's Executive Committee members, Lenaz and Camenzuli, the alleged assignment was neither acknowledged by a notary nor recorded in the USPTO, as required by 15 U.S.C. § 1060(a)(3). Regardless, under 15 U.S.C. § 1060(a)(1), any assignment of a trademark must include an assignment of the goodwill that is

associated with the trademark. The alleged assignment is void of any transfer of the marks' associated goodwill. Therefore, the January 15, 2015 letter from Lenaz to ETDO does not qualify as *prima facie* evidence of the execution of the alleged assignment. Coupled with the fact that it was never made of record in the Nonprofit corporate documents, nor made known to Nonprofit members, nor made an exhibit in the state court lawsuit that Lenaz and Camenzuli filed just one month prior to the instant lawsuit, the entire history of the letter makes the alleged assignment ineffective for any practical purpose.

5. **Display Of A DISCO AMIGOS Banner On The Van Does Not Qualify As Evidence Of Quality Control Over The Marks.**

The mere fact that the van carried a DISCO AMIGOS banner, in and of itself, cannot qualify as evidence of quality control over the marks by ETDO. Any rented van, just like ETDO's van, can be equipped to carry all kind of advertising for the lessee. Such advertising inures to the benefit of the lessee, not the vehicle owner. An easy example is the use of airplanes to carry a banner of an advertiser. Nobody would mistake the owner of the airplane with the owner of the trademark or trade name advertised on the banner; nobody would believe that the airplane owner can claim any rights in the marks displayed in the advertisement. That airplane can be rented by numerous entities to display their advertising. As a matter of fact, an ETDO truck was decorated with Donna Summers' emblem during the "Last Dance" that the Lenaz- Camenzuli-led group made in the 2020 Krewe of Tucks parade.[17] That emblem display could not possibly confer any trademark rights on ETDO for Donna Summers' intellectual property. So here, the use of the DISCO AMIGOS banner on the van did not confer any rights in the marks on ETDO.

6. **Promotional Activities By Lenaz and Camenzuli Were For The Benefit of Nonprofit.**

---

[17] Lenaz, Transcript of Bench Trial, Day 4 [Doc. 108], p. 642, lns. 6-11.

As members of Nonprofit, Lenaz and Camenzuli promoted Nonprofit, its performances at parades and charity events, solely for the benefit of Nonprofit. Lenaz and Camenzuli made appearances with other members of Nonprofit and signed contracts on behalf of Nonprofit. Nowhere in these contracts is there a mention of ETDO-JV. Actually, the entire notion of ETDO-JV came into being during the course of this litigation. Just like the alleged "assignment" and "implied license," the concept of a joint venture is a carefully crafted legend.

### 7. ETDO's Reliance On The Van Rentals Is Misplaced.

Plaintiff acknowledges that ETDO was hired to provide vehicle and sound support [Doc. 110, p. 19]. Even if the van carried the DISCO AMIGOS logo, the van owner, ETDO, did not provide any of the relevant services, those of performance and dance classes. The only providers of these services were Nonprofit members. It is inconceivable that anyone would realize that hiring of a van with sound equipment equates to a public notice that the hired van owner is the performers' "handler." In fact, any such suggestion was firmly rejected by Nonprofit members.[18]

### 8. Plaintiff Misinterprets Ms. McGurk, Ms. Rossi, And Ms. Bro's Testimonies.

Plaintiff suggests that Ms. Angela McGurk's[19] showing to Lenaz the marketing materials she had prepared for Nonprofit evidences Lenaz and Camenzuli's individual control over the quality of services offered under the marks. This conclusion is wrong. First, Lenaz and Camenzuli were Nonprofit Board members at the time and were empowered by the Board to oversee creation of the marketing materials. Second, McGurk testified that she reported to the Board and that was her hierarchy, and that she also reported to the Executive Committee, consisting of Lenaz, Camenzuli, and Lin until Lin left the Board.[20] So, yes, McGurk reported to Lenaz and Camenzuli

---

[18] Bro, Transcript of Bench Trial, Day 3 [Doc. 107], p. 497, lns. 6-13.
[19] Board member from 2016 to 2019.
[20] McGurk, Transcript of Bench Trial, Day 3 [Doc. 107], p. 526, lns. 24-25; p. 527, lns. 1-6.

but in their capacity as Board members, which is the only "hat" they wore when she worked with them. Still, the most relevant fact remains undisputed – none of the marketing materials ever mentioned ETDO, Lenaz, or Camenzuli as the trademark owners, nor identified them as the source of the relevant services. Nobody would have guessed, after seeing the marketing materials, that ETDO, Lenaz, or Camenzuli were the owners of the DISCO AMIGOS marks.

As to Rossi's testimony, there is no inconsistency, as erroneously suggested by Plaintiff.[21] First, when Rossi agreed that she knew "at least by this point" that Nonprofit paid ETDO prior to the June 2016 contract for use of the van,[22] she meant that she now knows in hindsight by virtue of the check written from Nonprofit to ETDO for the St. Joseph Day Parade in April 2016, which was not produced until discovery closed in this case, that Nonprofit paid ETDO for use of the van prior to the 2016 contract; and second, this position does not contradict Rossi's statement that (prior to information produced in discovery in this litigation) she believed that the use of the van was donated by Tiblier, a Nonprofit member.

Attempting to discredit Ms. Denny Bro's testimony, Plaintiff suggests that Ms. Bro (and Ms. McGurk) either did not serve long or at all on the Board.[23] In fact, Ms. Bro served on the Board from June 2013 until 2015.[24] The minimization of Ms. Bro's role is also contradicted by her involvement in early activities of Nonprofit, both before and after its formation. As one of the original Nonprofit members, from 2012 to present, Ms. Bro has an intimate "corporate" knowledge about the organization and its ownership. Plaintiff also tries to discredit Ms. Bro's testimony by stating that she was not part of the earlier meetings where two entities were discussed. However, Plaintiff does not cite to any documents evidencing earlier meetings that would have been

---

[21] Doc. 110, p. 17.
[22] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 625, ln. 24 through p. 626, ln. 5.
[23] Doc. 110, p. 18.
[24] Trial Exh. 164.

-10-

produced before the close of discovery. The after-the-close-of-discovery documents carry no probative value. Even Plaintiff's suggestion that Ms. Bro had to get "permission" from Lenaz and Camenzuli to order the t-shirts[25] is untrue.

Plaintiff also suggested that "the individual Defendants are people who joined the Nonprofit after 2016 and do not have the corporate historical knowledge of events that occurred with the Nonprofit from 2011-2016."[26] This is not true. Hudak has been a member of Nonprofit since 2014 and also served on the Board beginning in June 2016.[27] Further, Rossi testified that she has had conversations with members who have been in the organization since its inception.[28]

### 9. Plaintiff's Evidence Of Consumer Confusion Instead Supports Nonprofits' Counterclaims Against ETDO, Lenaz, And Camenzuli Under Counts I-VII.

Plaintiff suggests that witness testimonies provide evidence of consumer confusion in support of ETDO's first claim for relief. However, Plaintiff failed to prove ETDO's ownership of the marks, the prerequisite to any infringement claim. The facts that the Lenaz- Camenzuli-led minority-faction attempts to represent itself as the DISCO AMIGOS club, and of the consumer confusion caused thereby, actually underscore Nonprofit's, the marks' owner's, counterclaims for unfair competition, injury to business reputation, false advertising, and negligent interference. Therefore, Nonprofit is entitled to relief under these counterclaims while ETDO's first claim must be dismissed with prejudice.

### 10. ETDO's Second Claim For Relief Therefore Fails.

Plaintiff failed to prove ETDO's entitlement to relief under LUTPA because the entire claim hinges on the Court's finding that Defendants infringe ETDO's alleged trademarks.

---

[25] Doc. 110, p. 29.
[26] Doc. 110, p. 23.
[27] Doc. 51-7.
[28] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 299, lns. 8-11.

Plaintiff erroneously further asserts that Rossi "unilaterally removed board members from the secretary of state, froze and took control over the bank account of the Nonprofit and started acting as if it was the 'real' Nonprofit taking members who were loyal to those particular individual Defendants. The other group led by Lenaz was disparaged and forced to allow their bank account to be taken by the other group."[29] However, Rossi is a duly elected President of Nonprofit, as supported by the Board's Minutes of Meeting dated July 25, 2019.[30] As the duly elected President of Nonprofit, Rossi acted within the powers granted to her by Nonprofit's Bylaws.

Plaintiff also erroneously suggests that Rossi disparaged the Lenaz- Camenzuli-led group. Defendants were unable to find any such testimony.

Therefore, ETDO's second claim must be dismissed with prejudice.

**11. ETDO's Third Claim For Relief Also Fails.**

As with the trademark infringement claim, Plaintiff's failure to prove ETDO's ownership of the marks precludes finding of dilution, unfair competition, and entitlement to injunctive relief pursuant to La. R.S. 51:223.1. And so ETDO's third claim must be dismissed with prejudice.

**12. Nonprofit's Counterclaims Against Lenaz And Camenzuli Under Counts VIII-IX Are Valid And Proper.**

Plaintiff argues that these counterclaims lack merit because the issues of internal governance are not before this Court, but that a writ of quo warranto is pending in state court to address these matters. However, Nonprofit has asked this Court to rule on the issues of Lenaz and Camenzuli's breach of their fiduciary duties [Doc. 30, Counterclaim Counts VIII and IX); for declaration that Lenaz and Camenzuli's terms on the Executive Committee expired on August 31, 2019; [Doc. 30, p. 41, para. 100; p. 42, para. 107); and for declaration that individual Defendants

---

[29] Doc. 110, p. 20.
[30] Rossi, Transcript of Bench Trial, Day 4 [Doc. 108], p. 319, lns. 3-11.

are the true Nonprofit Board [Doc. 30, p. 42]. The Court accepted supplemental jurisdiction over these state law claims when it denied Plaintiff's Motion to Dismiss the Counterclaims [Doc. 43].

Plaintiff also suggests that "simple negligence alone is insufficient for finding of personal liability of an officer or director to a nonprofit corporation."[31] Yet, ETDO sued individual Nonprofit's Board members without any proof of their wrongdoing. Apparently, Lenaz and Camenzuli do not wish the same standards to be applied to them. Besides, Plaintiff's cited-*Sam* case has no bearing on the instant lawsuit. The instant lawsuit does not involve criminal acts of third persons, but rather involves double-dealing of corporate officers, Lenaz and Camenzuli, who owed personal duties of care and loyalty to Nonprofit and to its Board and to its members.

Similarly, reference to an ERISA-based decision (*Ret. Plans Comm. of IBM v. Jander,* 140 S.Ct. 592 (2020)) is inapplicable here because Nonprofit did not ask Lenaz and Camenzuli to violate another entity's trademark rights nor commit any crimes. Instead, Nonprofit asserts that Lenaz and Camenzuli owed their duties, first and foremost, to the entity where they served as elected officers; not to their own for-profit company, ETDO. In such case, the holding in *Noe v. Roussel*, 310 So.2d 806, 818-19 (La. 1975) is particularly relevant:

> [A]n agent who acquires his principal's property, or one who otherwise acts in a fiduciary capacity, bears the burden of establishing that the transaction was an arm's length affair. This means that the agent or fiduciary must handle the matter as though it were his own affair. It also means the agent or fiduciary may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights of his principal against all other persons whomsoever, and is bound not to act in antagonism, opposition or conflict with the interest of the principal to even the slightest extent. The reason for the rule is obvious.

It is apparent that Lenaz and Camenzuli's actions did not meet this standard.

Plaintiff states Rossi was on the Finance Committee and that she had access to the financial records; was trained on how to enter transactions, the naming conventions, and how to handle

---

[31] Doc. 110, p. 27.

transactions from the nonprofit to ETDO; and wrote out the checks.[32] However, Rossi testified that as a member of the Finance Committee, she would try to get a meeting on the books but Lenaz, Nonprofit's Treasurer from 2014 to 2019, was never available.[33] Rossi testified that she had access to Xero and did data entry bookkeeping.[34] Rossi did not have check signing authority, and the only ones who did were Lenaz and Camenzuli.[35] Also, Lenaz was the Nonprofit's Treasurer for five years [Trial Exh. 164] and ultimately, all Nonprofit's financial matters were his responsibility.

Plaintiff argues that Lenaz is not personally responsible because he did not write checks to himself, but to ETDO, and that Lenaz and Camenzuli did not financially benefit personally from Nonprofit.[36] However, such arguments do not hold water. ETDO has only four members – Lenaz, Camenzuli, Tiblier, and Lin. In the limited liability company, such as ETDO, all members are direct beneficiaries of any profit distribution by the company. Also, Camenzuli, an ETDO owner, testified that he is ETDO, thus making no distinction between himself and the company.[37] Such attitude was prevalent in the treatment of ETDO, as a personal for-profit company, by its members. This is the reason why Lenaz and Camenzuli created the fiction of the assignment, pretending to distance themselves from the transaction but at the same time, directly benefitting their own company and themselves. This is why Lenaz and Camenzuli entered into contracts with the third parties for rental of the van and sound equipment and imposed on Nonprofit to provide performances without reimbursing Nonprofit, while keeping the fees for both in ETDO's account. It is not feasible, considering Lenaz' "startup business expertise" background, that he did not appreciate the consequences of his and Camenzuli's actions.

---

[32] Doc. 110, p. 28.
[33] Rossi, Transcript of Bench Trial, Day 2 [Doc. 106], p. 317, ln. 24 through p. 318, ln. 2.
[34] Rossi, Transcript of Bench Trial, Day 2 [Doc. 106], p. 315, lns. 14-21l; p. 316, lns. 8-22.
[35] Rossi, Transcript of Bench Trial, Day 2 [Doc. 106], p. 317, lns. 3-10.
[36] Doc. 110, p. 30
[37] Camenzuli, Transcript of Bench Trial, Day 1 [Doc. 105], p. 68, lns. 9-10.

Thus, Nonprofit proved its entitlement to judgment in its favor on all its counterclaims.

**13.  Plaintiff Misapplies the *Lyons* Decision.**

Plaintiff claims that *Lyons* is not applicable because *Lyons* does not involve members of the same company disputing as to who owns the trademark. However, ETDO claiming trademark ownership, not Lenaz and Camenzuli, is the entity who sued Nonprofit and its Board members. Plaintiff apparently wants to negate the close similarity of the facts in this lawsuit with the *Lyons* case because the facts support Nonprofit's position. Although unlike Sheila Lyons, Lenaz and Camenzuli stayed in Nonprofit as Executive Committee members at all relevant times and, though furtively, acted for the benefit of their own company, ETDO. This double-dealing is evidenced by their later claim of ownership of the most valuable asset of Nonprofit, the intellectual property, and the attempted secret transfer of that asset to their own company. Thus, the same factors apply as in *Lyons*.

**a.  The Parties' Objective Intentions Or Objective Expectations:**

Similar to Sheila Lyons, who held herself out to the AVMA as a member of the committee, Lenaz and Camenzuli did not communicate to any of the other Board members their belief that they owned the marks, nor any objection to Nonprofit using the marks. Similar to Sheila Lyons, while Lenaz and Camenzuli's subjective belief may have been that they owned the marks, their objectively manifested expectations contradict that notion. Thus, substantive evidence supports Nonprofit's position that "the parties' objective intentions or expectations" favors Nonprofit.

**b.  The Public Associates DISCO AMIGOS Marks with Nonprofit.**

Substantial evidence presented at trial supports Nonprofit's position that the general public associates the marks with Nonprofit, not Lenaz and Camenzuli and even less so with ETDO or the van.

Plaintiff suggests that without Lenaz and Camenzuli's "initiating and formative actions" in the beginning of Nonprofit's operations, the "individual member efforts since then would be less than effective."[38] Plaintiff misinterprets the standard for establishing public recognition of a trademark. Only trademarks that identify the source of services are eligible for protection. Unlike copyrights that exist from the moment of creation, trademarks generally develop over a period of time – gathering strength through public recognition. It is Nonprofit membership that worked tirelessly for eight years that developed any value in the marks, it is Nonprofit membership that developed the goodwill in the marks, not Lenaz and Camenzuli's "initiating actions."

It is therefore not surprising that 90% of pre-2020 Nonprofit membership remained with Nonprofit, while only 10% of that membership departed with the Lenaz- Camenzuli-led group.

### c. Nonprofit Board Exercised Quality Control Over The DISCO AMIGOS Marks.

Nonprofit presented ample evidence of its Board exercising quality control over the use of the marks through various Committees that reported directly to the Board. The mere fact that some members worked closely with Lenaz and Camenzuli does not diminish the obvious – Nonprofit provided the relevant services, Nonprofit controlled choreography, music, and costumes, Nonprofit acquired the members' intellectual property through membership agreements, and Nonprofit organized entertainment and educational events.

Plaintiff argues that the "relevant public looks to the two founders, Lenaz and Camenzuli as the 'Disco Amigos' and owners of the iconic gold conversion van 'the golden bull' (El Toro de Oro) for services and quality control of the brand.[39] One example that Plaintiff offers is the 2020 Krewe of Carrollton parade, where Nonprofit did not participate because Mr. Cambus allegedly knew only Camenzuli, who by that time was in the Lenaz- Camenzuli-led group. However, that

---

[38] Doc. 110, p. 36.
[39] Doc. 110, p. 37.

small group could not participate in the parade because it had only few performers, not because of any adverse action of Nonprofit. These facts do not help Plaintiff in meeting its burden of proof of to whom the public looks for quality control.

Plaintiff also erroneously suggests that "ETDO offers talent, DJ services, hard assets like the van and production equipment under the name 'Disco Amigos.' ETDO undertook pro-bono events for charitable causes as fund raisers, in furthering its brand recognition with the relevant public."[40] The plain facts contradict this statement – ETDO only has one rental van and some production equipment. The talent and performers are all part of Nonprofit's membership, who continue offering relevant services to the public.

In sum, all three *Lyons* factors favor Nonprofit. Nonprofit thus requests that the Court issue a decision declaring Nonprofit as the only true owner of the DISCO AMIGOS marks.

**14. Regarding Nonprofit's Damages Due To ETDO's Unauthorized Payments:**

Plaintiff argues that Nonprofit did not suffer any damages, and that Nonprofit did not honor its contract with ETDO to give a 45-day advance notice of termination. However, the production services agreements [Trial Exhs. 158 & 159] state that the contract will remain in effect as long as the nature, scope, and number of services remain the same. Both Rossi and Mr. Guercio testified that the van broke down in summer of 2018 thus altering the nature, scope, and number of services provided by ETDO because there was no van available. Whereas Plaintiff states in the brief that the notice of cancellation of the contract must be in writing,[41] the production services agreement's notice provision states that 45-day notice of the change can be either in writing or verbal.

The Board repeatedly asked ETDO for renegotiation of the agreement with no response. As Mr. Guercio stated, Lenaz and Camenzuli refused to allow a vote on the renewal of the contract

---

[40] Doc. 110, p. 37.
[41] Doc. 110, p. 38.

because in his opinion, they were afraid that the contract would not be renewed.[42] During his service on the Board, Mr. Guercio became familiar with the service agreement.[43] Among other things, Nonprofit was paying for ETDO's equipment repairs,[44] paying for the new van ($13,000),[45] and paying for equipment storage even though storage of this equipment was ETDO's responsibility. That was the reason why Mr. Guercio resigned from the Board. Thus, Nonprofit is entitled to at least reimbursement of over $20,000 for unauthorized payments to ETDO.

Plaintiff also failed to inform Nonprofit that it charged third parties for Nonprofit's appearances at charitable events, and never remitted any portion of the fees collected from these events to Nonprofit. Nonprofit should be entitled to said fees.

**15. Regarding Attorneys' Fees and Costs:**

Contrary to Plaintiff's suggestion, it is Nonprofit who is entitled to recovery of attorneys' fees, costs, and treble damages in this action. ETDO, Lenaz, and Camenzuli not only filed two meritless lawsuits against Nonprofit, but they also sued individual Board members, now in state and federal courts, for acting in accordance with their Bylaws-authorized manner <u>after</u> Lenaz and Camenzuli had resisted the Board's efforts to procure Directors' and Officers' insurance, indicating it was completely unnecessary, before the controversy existed.

Without said insurance, Nonprofit and individual Defendants were forced to spend considerable sums in defending this lawsuit. Nonprofit reasonably believed that it is the Nonprofit who is the rightful owner of the marks, and neither the alleged "implied license" nor alleged assignment existed during the first seven years of Nonprofit's operation. The "implied license"

---

[42] Guercio, Transcript of Bench Trial, Day 2 [Doc. 106], p. 453, lns. 10-14; p. 462, ln. 25 through p. 463, ln. 5.
[43] Guercio, Transcript of Bench Trial, Day 2 [Doc. 106], p. 464, ln. 24 through p. 466, ln. 25.
[44] Guercio, Transcript of Bench Trial, Day 2 [Doc. 106], p. 458, lns. 14-15.
[45] Guercio, Transcript of Bench Trial, Day 2 [Doc. 106], p. 460, lns. 6-8, 18-21; Trial Exh. 96.

suddenly came into being in August 2019 when Nonprofit was ambushed with ETDO's demand for royalty fees; and the assignment came into existence sometime between September 2019 (when Lenaz, Camenzuli, and Janowski filed the state court action) and October 2019 (when the instant lawsuit was filed by ETDO, i.e. Lenaz and Camenzuli).

During this litigation: Plaintiff failed to cooperate in good faith during discovery, steadfastly refused to restore Nonprofit's access to corporate databases, and then presented documents, after the close of discovery, that would not have been admitted had Nonprofit had full access to the corporate databases; and Plaintiff's counsel created needless controversy that could not be resolved between the counsel, thus costing Nonprofit additional expense.

In sum, Nonprofit demonstrated it is entitled to the relief it asked in its counterclaims. Favorable consideration of Defendants' claims and defenses are respectfully requested.

**RESPECTFULLY SUBMITTED** this 20th day of November 2020.

/s/ *Thomas S. Keaty*
Thomas S. Keaty (#7666) – TA
KEATY LAW FIRM LLC
365 Canal Street, Suite 2410
New Orleans, Louisiana 70130
(504) 524-2100
tskeaty@keatypatentfirm.com

-and-

/s/ *Steven M. Hannan*
Steven M. Hannan (#33878)
Hannan, Giusti & Hannan L.L.P.
2201 Ridgelake Drive
Metairie, Louisiana 70001
(504) 831-5300
steven@hghlaw.com

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on November 20, 2020 a copy of the above and foregoing DEFENDANTS' REPLY TO PLAINTIFF'S POST-TRIAL MEMORANDUM was served upon all known counsel of record via the Court's CM/ECF electronic filing system.

By: /s/ *Thomas S. Keaty*
**THOMAS S. KEATY**